## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 11-80692-CIV-HURLEY

**BRANCH BANKING & TRUST COMPANY**
**of VIRGINIA,**
      **Plaintiff,**

**vs.**

**M/Y "BEOWULF," Official No. 1137719, etc.,**
***in rem*,**
      **Defendant.**
_____/

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DE# 49]

This is an *in rem* admiralty action to foreclose the first preferred ship mortgage held by

plaintiff Branch Banking & Trust of Virginia ("the bank") on the defendant vessel, the M/Y

"Beowulf." Sunfish Marine Ventures, Ltd. ("Sunfish" or "claimant"), the current owner of the vessel

and sole claimant in this action, claims interest in the vessel as a subsequent bona fide purchaser for

value without notice.

The case is before the court upon the bank's motion for final summary judgment, including

request for entry of an order directing sale of the vessel.  In addition, the bank requests permission

to credit bid part or all of its judgment in lieu of cash at the sale.

Opposing the motion, Sunfish contends, in main part, that summary judgment is precluded

by disputed issues of fact concerning the purported mortgagor's title to the vessel and corresponding

ability to convey a valid security interest to the bank in the first instance.  Alternatively, Sunfish

contends that the summary judgment is precluded by genuine issues of material fact on the issue of

whether the bank's reckless lending practices – both at the time it made the original loan and when

it later modified the loan term – should cause the bank's preferred ship mortgage, if any, to be

equitably subordinated to the ownership interest asserted by Sunfish as a subsequent innocent purchaser for value.

## I. Facts[1]

In January, 2003,  Sculley Boatbuilders ("Sculley") completed original construction of a 60' vessel, then known as the "*Sculley 60*," and assigned it Hull Identification No.("HIN") GIJ60001A303.[2]  Although the Coast Guard requires that manufacturers permanently affix a HIN number on vessels which they build,[3] Sculley did not affix a HIN to the transom of this yacht.

---

[1]  The facts recited are undisputed by the parties unless otherwise noted, and are derived mainly from the following materials: (1) The parties' Local Rule 7.5 statements of material undisputed facts and counter-statements of disputed facts; (2)  Deposition of the bank's designated corporate representative, Dean McBayer, Vice President, Portfolio Administrator [DE# 53-1, 64-1]; (3) BB & T of Virginia Retail Note,  Security Agreement and Hypothecation dated January 17, 2003 [DE#1-1]; (4) First Preferred Ship Mortgage dated January 17, 2003 [DE#1-2]; (5)   Retail Modification Worksheet [DE # 64-3]; (5) Builders' Certification and First Transfer of Title dated January 17, 2003 [DE# 29-9]; (6) Builder's  Certification and First Transfer of Title dated June 12, 2003 [DE# 25-1]; (7) General Index or Abstract of Title [DE# 53-3]; Application for Initial Issue of Certification of Documentation  [DE# 25-5]; Certificate of Documentation [DE# 25-8].

[2]  A Hull Identification Number is required by the U.S. Coast Guard to be located on the transom of all vessels constructed in the United States.  A Hull Identification Number is a serial number for vessels.  The last two digits of a Hull Identification Number denote the year in which a vessel was constructed. 33 C.F.R. §181.25.  The manufacturer or builder is required to affix the HIN to the vessel in two locations. See  33 C.F.R. §181.23.

[3]  Vessel identification by HIN or other clearly descriptive data as also a pre-requisite to official documentation under  46 C.F.R. § 67.205:

(a)  Every instrument presented for filing and recording must contain sufficient information to clearly identify the vessel(s) to which the instrument relates ...(c)... Vessels which have never been documented must be identified by one of the following: (1) The vessel's Hull Identification  Number assigned in accordance with 33 CFR 181.25, or (2) Other descriptive information, which clearly describes the vessel.  Such information may include length, breadth, depth, year of build, name of manufacturer and nay numbers which may have been assigned in accordance with 33 C.F.R. Part 173.

According to Sculley's then general manager, James Polatty, most purchasers of custom yachts do not like the appearance of a number on the hull, so Scully typically placed the number inside a drawer on the boat instead of affixing it to the hull.

Shortly after construction was complete, James C. Sculley ("Mr. Sculley"), the president of Sculley Boatbuilders, applied for a personal loan from the bank offering the *Scully 60* as collateral. In support of his application, Mr. Sculley provided a January 8, 2003 vessel survey prepared at his request by Harbor Marine Services which estimated the value of the boat to be $2,375,000.00.

The bank approved the loan, and on January 17, 2003, loaned $1,000,050.00 to Mr. Sculley, evidenced by a "Retail Note and Security Agreement"("the note") of the same date signed by Mr. Sculley in his individual capacity [DE# 64-2].  In the note, Mr. Sculley acknowledged that he has granted the bank a security interest in certain personal property described in a separate agreement (the *Scully 60)* as security for the loan, and that he has executed a mortgage in favor of the bank for recording.  Under the line where "James C. Sculley" signed as "debtor," a separate, additional signature block captioned with the following type is inserted:  "The following owners of the vessel are signing this Note only for the purpose of granting a security interest therein ans (sic) are not borrowers."  Under this text appears a signature line bearing Mr. Sculley's signature, underneath which is typed, "Grantor of Security Interest: Sculley Boatbuilders, Inc., James S. Sculley, Member." Notably, the separate "Retail Security Agreement," and "Hypothecation Agreement" signed on the same date as the note also refer to the owner of the collateral (and grantor of the security interest) as "Sculley Boatbuilders, Inc." [DE# 25-9, 25-10].[4]

---

[4]  In conjunction with this security arrangement, the bank apparently required execution of a "Certificate of Corporate Resolutions and Authorization to Borrow" on a bank form bearing the "BB & T of Virginia" logo.  This certificate bears the signature of "James C. Sculley," acting as President and Secretary of Sculley Boatbuilders, Inc., and purports to certify that the officers of

Mr. Sculley contemporaneously signed a "First Preferred Ship Mortgage" ("the mortgage") as "sole owner" of the *Sculley 60*" purporting to grant the bank a mortgage on the vessel, described as a 2003 60' Sculley, HIN GIJ60001A303 [DE# 1-2]. The mortgage recites that it is made by "James C. Sculley," the "the sole owner of 100% of the interests in the vessel which is being mortgaged," for purposes of securing a promissory note made by James C. Sculley on that same date.

Also on January 17, 2003, Mr. Sculley filed a Builder's Certification and First Transfer of Title with the United States Coast Guard's National Vessel Documentation Center ("NVDC") [DE# 29-9] identifying "James C. Sculley" as the "name ... of party ... for whom [the *Sculley 60*, HIN GIJ60001A303, was] built." This certification recites that it is signed by James C. Sculley, "acting in [his] capacity as President of Sculley Boat Builders."

On February 3, 2003, Mr. Sculley applied to the United States Coast Guard ("Coast Guard") for initial issue of a certificate of documentation for the *Sculley 60*, HIN GIJ60001A303, identifying himself as the sole owner of the vessel [DE# 25-5]. On March 27, 2003, the Coast Guard granted the application and issued a Certificate of Documentation identifying James C. Sculley as managing owner of this vessel. With this certification, the Coast Guard assigned Official No. 1137719 to the *Sculley 60* [DE# 25-8]. On February 3, 2003, the bank recorded the above referenced mortgage on the *Sculley 60* with the Coast Guard's NVDC, identifying the encumbered vessel as the *Sculley 60*, HIN GIJ60001A303.

A few months later, in June 2003, Sculley sold the *Sculley 60* to Juanillo Corporation ("Juanillo"), a Puerto Rican corporation. It contemporaneously submitted a builder's certificate and

---

"Sculley Boatbuilders, Inc." have authorized and empowered James C. Sculley with unlimited ability to pledge collateral to secure and /or guarantee his personal debts [DE# 54-1]. This form is undated and does not appear to bear a corporate seal in the designated block.

application for certificate of documentation dated June 12, 2003 to the United States Coast Guard on behalf of Juanillo.  This time, the builder's certification identifies "Sculley Boatbuilders, Inc." as the "party for whom [the *Sculley 60* was] built," and recites that it is signed by James Polatty, "acting in [his] capacity as Gen. Mgr of Sculley Boatbuilders, Inc."  This document identifies the vessel as Official No. 1137719, as previously assigned by the Coast Guard,  HIN GIJ60001A303, as originally assigned by Sculley Boatbuilders.

On  September 23, 2003, James Polatty apparently authored a letter to the Coast Guard advising that Scully Boatbuilders had  "inadvertently duplicated issuance of a hull number" when it issued the second builder's  certificate to Juanillo on June 12, 2003, and that an incorrect HIN was therefore included in its corresponding June 23, 2003 application to the Coast Guard for a certificate of documentation on behalf of Juanillo.  Mr. Polatty advised that the HIN should have been listed as  GIJ6000**3D**303 [instead of GIJ6000**1A**303], and asked the Coast Guard to correct its documentation accordingly, with issuance of a new official number for the *Sculley 60.*[5]

The Coast Guard complied and issued a new official number (Official No. 1148420) to correspond with Sculley's newly created  HIN for the *Sculley 60.*  Sculley then revised Juanillo's application for certificate of documentation, by scratching out 'Official No.  1137719,' and replacing it with 'Official No. 1148420' and changing the HIN  to read:  "HIN GIJ6000**1**D303," (apparently intended as HIN GIJ6000*3*D303).

The Coast Guard created a new abstract of title to correspond with the "corrected" HIN and

---

[5] In his deposition testimony,  Polatty stated  that this letter appeared to bear his signature, but that he had no memory of writing or signing it, and could not explain why he would have sent such a letter.  He said he could conceive of no purpose for requesting a second HIN and official number for the *Sculley 60* because Sculley Boatbuilders manufactured only one 60' Sculley in 2003, i.e. the vessel which it sold to the Juanillo Corporation under the originally assigned  HIN.

official number, listing Sculley Boatbuilders, Inc. as grantor and Juanillo Corporation as grantee [DE# 53-3]. The bank's mortgage, recorded under the originally assigned HIN and official number, was not transferred to the new abstract of title. As a result, from this point forward, there were two chains of title on the *Sculley 60*, with the latter failing to reflect the bank's outstanding earlier recorded preferred ship mortgage. [6]

On January 11, 2005, Juanillo Corporation transferred title of the *Sculley 60*, HIN GIJ60003D303, Official No. 1148420, back to Sculley Boat Builders, Inc., apparently as part of a lawsuit settlement. A year later, on January 30, 2006, Sculley Boatbuilders, Inc. sold the vessel to Forest Stream Sportfishing, LLC ("Forest Stream") [DE# 53-3].

On April 15, 2008, Forest Stream signed a bill of sale conveying the vessel to Sunfish in exchange for $1.25 million dollars (cash). The purchase and sale agreement between Sunfish and Forest Stream identifies the vessel as HIN GIJ60003D303, Official No. 1148420.

Shortly before the conveyance to Sunfish, in January, 2008, Mr. Sculley missed the final balloon payment ( $863,999.00) due under the note, allegedly due to sickness and/or oversight. Despite that lapse, which followed a history of eight late payments, the bank agreed to modify his loan and extend its term for an additional five years. Before granting the modification, the bank did not conduct a new appraisal or otherwise inspect the vessel to ensure that it still had sufficient value to serve as collateral for the loan, or to ensure that the vessel even existed; it did not require proof

---

[6] In earlier evidentiary proceedings, Thomas Willis, a former supervisor for the Coast Guard's NVDC, testified that the Coast Guard does not independently verify information provided to it when an application for documentation is made. Further, when a HIN is corrected and the Coast Guard assigns a new official number to a vessel, lienholders who recorded their mortgage under the original HIN are not notified by the Coast Guard. Nor does the Coast Guard automatically cross-reference the original and corrected identification numbers on abstracts of title so as to provide notice to future purchasers.

of insurance; it did not inspect the vessel to confirm the identity of the HIN; it did not perform a credit check or perform other due diligence on Mr. Sculley's then credit-worthiness, despite information in his modification application revealing that his assets had plummeted from over $11 million dollars in 2003 to approximately $435,000 dollars in 2008; that his monthly income had dropped from $26,435 to $15,000; that he owed $1.3 million dollars in new debt; that he had suffered a decrease in liquidity of about $100,000.00; that he had close to $400,000 in outstanding tax liens against himself or his businesses, and that his "Beacon" credit score had dropped approximately 75 points.

Apparently, when it agreed to extend the term of the loan, the bank noticed an inconsistency between the owner of the collateral (Sculley Boatbuilders, Inc.) and the name of the maker/debtor (James C. Sculley) recited in the original note, and corrected the modified note accordingly, as referenced in the "comment" section of the bank's modification worksheet [DE# 64-3], and as shown on the "Retail Note Modification Agreement" dated February 28, 2008 [DE# 54-1], which recites that it is made by and between James C. Sculley, as borrower, the bank, *and* "Sculley Boatbuilders, Inc., Sculley Boatbuilders," as "owners other than [b]orrower.. of any property designed to secure performance of borrower's obligations to the bank." However, as acknowledged by current bank Vice-President, Dean McBayer, the bank did not take any steps to correct the mortgage document in consistent fashion [DE 64-1, pp. 46-48].

James Sculley died in June 2009, leaving a principal unpaid balance due under the note of $823,573.98. In order to take possession of the vessel from Sunfish, and to collect on the outstanding debt, the bank instituted the instant action on June 16, 2011. On July 6, 2011, the vessel was arrested by the United States Marshal Service and has since been placed in the custody of

National Maritime Services (Fort Lauderdale, Florida), the court appointed substitute custodian for the vessel.

## II.  Summary Judgment Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986), citing Fed. R. Civ. P. 56(c).  A fact is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action.  *Id.* at 248.  An issue is "genuine" if the evidence on record, as a whole, is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The moving party bears the initial burden of showing the court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 9 L. Ed.2d 265 (1986).  This burden may be met by showing that there is a lack of evidence to support the non-moving party's case. *Id.* at 325. Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.  *Anderson,* 477 U.S. at 256, 106 S. Ct. 2505.  A party opposing a motion for summary judgment may not rest on mere allegations or denials in its pleadings, but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

In ruling on a motion for summary judgment, the court must view the evidence and all

related factual inferences in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998*); Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368 (11th Cir. 1982). The court must then decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997), quoting *Anderson*, 477 U.S. at 251-52, 106 S. Ct. 2505.

### III.  Discussion

A creditor obtains a "preferred mortgage" under the Ship Mortgage Act,  46 U.S.C. §31301 *et seq*.  ("the Act") if the mortgage (1) includes the whole of  the vessel, (2) covers a documented vessel, (3) lists as mortgagee a federally insured depository institution, and (4)  is filed in "substantial compliance" with § 31321.  See 46 U.S.C § 31322(a).  Under § 31321,  to be filed in "substantial compliance" with the Act,  the mortgage  must  (1) identify the vessel, (2) state the name and address of each party to the instrument, (3) state the amount of the direct or contingent obligations secured by the mortgage, (4) state the interest of the  mortgagor in the vessel, (5) state the interest mortgaged, and (6) be signed and acknowledged.  46 U. S. C. § 31321(b).

Where all requirements for preferred status under the Act are met, and the mortgage is duly recorded, a preferred ship mortgage has priority over all subsequent claims, even  those asserted by bona fide purchasers for value. *Maryland National Bank v. Madame Chapel*, 46 F.3d 895, 901 (9th Cir. 1995).

In this case, the bank contends that the record undisputably reflects a duly recorded, valid mortgage meeting all these  requirements, thus entitling it to a priority lien superior to the claimed ownership interest of Sunfish, a subsequent purchaser for value.  However, merely following the

correct recording procedures does not automatically create a valid preferred mortgage entitled to priority. *Custom Fuel Services, Inc. v. Lombas Industries, Inc.,* 805 F.2d 561 (5th Cir. 1987). Rather, the initial burden is on the bank to establish Mr. Sculley's ownership of the *Sculley 60* as part of its burden in establishing the validity of the underlying mortgage and preferred ship mortgage status under the Act. *C.I.T. Corp. v. Oil Screw Peggy*, 424 F.2d 767 (5th Cir. 1970)(La); *ITT Indus. Credit Co. v. M/V Richard C*, 617 F. Supp. 761 (E. D. La. 1985).

The court thus begins its inquiry into the validity of the bank's claim to a preferred ship mortgage  by examining Florida law to determine whether James C. Sculley, who signed the mortgage in his individual capacity as the "sole owner" of the *Sculley 60*,[7]  in fact held legal title to the vessel and had capacity to convey any security interest in it at the time he executed the mortgage. *See S.C. Loveland, Inc v. East West towing, Inc.,* 608 F.2d 160, 164 (5th Cir. 1979), *cert. den*., 446 U.S. 918 (1980)(state law defines what constitutes legal title because contracts for the sale of a ship are not "maritime"); *St. Paul Fire & Marine, supra.*

## A.  Validity of Underlying Mortgage

---

[7]  At oral argument, the bank argued that Mr. Sculley personally owned the boat, or alternatively had been granted permission by Sculley Boatbuilders, Inc. to use its corporate property as collateral for a personal loan.  As a threshold matter, it would appear that the bank's only knowledge of Mr. Sculley's purported  authority to mortgage  the property of Sculley Boatbuilders Inc. is based on Mr. Sculley's own self-serving representations and his willingness to execute the undated  "Certificate of Corporate Resolutions and Authorization to Borrow" form supplied by the bank.  There is no evidence that the bank took any action to verify Mr. Sculley's authority to bind the corporation, either at time of the original loan was made or in the context of the  instant summary judgment proceedings. *56 East 87th St. Units Corp. v. Kingsland Group, Inc.,* 30 AD3d 1134 (president of corporation  lacked authority to obligate the corporation notwithstanding lender's prior dealings with that individual).

Further, even if Sculley Boatbuilders had properly authorized  Mr. Sculley to use the vessel as collateral for a personal loan, it is ultimately of no moment because it is undisputed that Mr. Sculley did not sign the mortgage in his capacity as president or any other corporate capacity for Sculley Boatbuilders, Inc. – the only entity with power to convey the interest.  Instead, he signed as "James C. Sculley," as the "sole owner"  of  the vessel.

As a threshold matter, it is clear that the M/Y Beowulf constitutes "goods" within the meaning of Florida's Uniform Commercial Code (UCC). *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No., 01*, 625 F.2d 44 (Fla. 5th Cir. 1980)(Fla. law); *Northern Ins. Co. of New York v. 1996 Searay Model 370DA Yacht*, 453 F. Supp.2d 905 (D. S.C. 2006).

Thus, a determination on the validity of the bank's claimed mortgage interest will necessarily depend on whether Mr. Sculley held good or valid legal title to the vessel under application of the Florida UCC at the time he executed the mortgage. If he did not, he had no power to pass a valid security interest in the property to the bank in the first instance, rendering the mortgage invalid. *See e.g. Wagner v Roberts,* 320 So.2d 408 (Fla. 2d DCA 1975)(where mortgagor did not own the property when mortgage was executed, mortgage was not valid)*; United States v. One Parcel of Real Estate at 3229 S.W.23rd St., etc.,* 768 F. Supp. 340 (S.D. Fla. 1991)(Under Florida law, mere execution of mortgage on property is not evidence of any ownership or property interest in property); *Gonzalez v. Chase Home Finance LLC,* 37 So.3d 955 (Fla. 3d DCA 2010)(mortgagor could convey no greater interest in the property than he owned).

A defectively executed or invalid mortgage is not entitled to be recorded. If such a mortgage is recorded, it does not give constructive notice to anyone, and is invalid as against subsequent purchasers for value. *See Summa Investing Co. v. McClure,* 569 So.2d 500 (Fla. 3d DCA 1990)(mortgage which was defectively acknowledged was not entitled to recording, and thus could not serve as constructive notice to subsequent purchasers). *See also In re Phalen*, 445 B. R. 830 (S.D. Ohio 2011); *In re Willis*, 2008 WL 444547 (D. Vt. 2008); *Thomas v. Thomas,* 923 N. E.2d 465 (Ind. App. 2010)(mortgage  invalid based on mortgagor's fraud regarding mortgagor's forged release of claimant's mechanics' lien; mortgagee imputed with notice of fraud where it failed  to

investigate mortgagor's interest in home at time mortgage was obtained ); *In Re Giroux*, 2009 WL 1458173 (D. Mass. 2009) and cases cited *infra*.

The court's inquiry thus turns to the sufficiency of evidence going to ownership of the *Sculley 60* as of the date of the mortgage, January 17, 2003.  The  bank argues that three documents irrefutably establish Mr. Sculley's legal title to the vessel as of that date:  (1) the original builder's certification and transfer of title listing Mr. Sculley as the  person for whom the vessel was built; (2) the NVDC's  original General Index and Abstract of Title listing Mr. Sculley as owner of the vessel; and (3) the NVDC's original Certificate of Documentation identifying Mr. Sculley as owner.

Although it is true that Mr. Sculley, individually, at one point  possessed a NVDC Certificate of Documentation for the *Sculley 60*  under the first assigned HIN, a ship's documentation of title is not conclusive evidence of ownership in cases where ownership is at issue.  *See* 46 U.S.C.  § 12104(3); *St. Paul Fire & Marine Ins. Co. v. Vest Transportation Co.,* 666 F.2d 932, 938 (5th Cir. 1981)("[A] ship's documentation of title, while *prima facie* evidence of ownership, is not conclusive and that true ownership of a vessel is not dependent upon its registry")(citations omitted); *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No., 01*, 625 F.2d 44, 48  (Fla. 5th Cir. 1980)("federal registration does not, of itself, confer emoluments of title and ownership to a vessel"). *See also  Northern Ins. Co. of  New  York  v. 1996 Searay Model 370DA Yacht*, 453 F. Supp.2d 905 (D. S.C. 2006) (bill of sale filed with Coast Guard did not determine ownership of vessel);  *Benetic v Alexander*, 2001 WL 1843781 *4 (C.D. Cal. Aug. 13, 2001)(same) ;  *Hozie v. The Vessel Highland Light,* 182 F.3d 925, 1999 WL 313650 (9th Cir. 1999); *Watkins  v. Kennedy Ship & Repair*, 2008 WL 7628241 (S.D. Tex. 2008).

Nor does the original "builder's certificate" and "first transfer of title," listing Mr. Sculley

as the "person for whom [the vessel was] built," conclude the title issue. *Chase Manhattan Financial Services v. McMillian*, 896 F.2d 452, 460 (10th Cir. 1990)("[T]he builder's certificate is *prima facie*, but not conclusive, evidence of title because it is part of the paperwork required by the Coast Guard for the certificate of documentation process").

Recognizing that "true ownership of a vessel is not dependent upon its registry," *See St. Paul Fire & Marine* at 938*,* and cases cited *supra*, the court looks to the Florida Uniform Commercial Code, and particularly § 672.403(3), to determine the issue.  This provision provides:

> Unless otherwise explicitly agreed where delivery is to be made without moving the goods,
>
> (a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such document;
>
> or (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time of contracting.

Section § 671.201(15), in turn, thus defines  "document of title":

> Document of title includes bill of lading, dock warrant, dock receipt , warehouse receipt or order for the delivery of goods , and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is  entitled to receive, hold and dispose of the document and the goods it covers. *To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass*.

§ 671.201(15), Fla. Stat. (2011)(emphasis added)

While the original builder's certification, abstract of title and certificate of documentation may be documents delivered in ordinary course of business to the purchaser or grantee of  a newly manufactured vessel, they do not import bailee status, and therefore do not qualify as "documents of title" as that concept is defined under § 671.1-201(15).  *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No., 01*, 625 F.2d 44 (Fla. 5th Cir. 1980)(Fla. law).  As explained by the Fifth

Circuit:

> The meaning and purpose of "documents of title is narrowed and clarified by the second sentence which reads, "To be a document of title a document must purport to be issued by or addressed to a bailee and purports to cover goods in the bailee's possession which are either identified or are fungible portions fo an identified mass."
> ....When the second sentence is read together with the first sentence , the commercial usage of a document of title becomes apparent.  Generally speaking, a document, such as a warehouse receipt is sent to a purchaser of goods contemporaneously with shipment of the goods, covered by the document to a warehouseman-bailee.  The purchaser then produces the document for the warehouseman to prove his right to take possession of those goods.  Sometimes prior to claiming the goods, the purchaser holder of the document will negotiate the document or obtain a loan upon it. ... A holder of a document of title, as contemplated by the Code, has title to the document and title to the goods it covers  by virtue of possession of the document. ... When considered in proper context, the law is clear that whatever a Master Carpenter's Certificate or Manufacturer's Statement of Origin are, they are not 'documents of title' as that term is  used in the Uniform Commercial Code.

Id. at  49.

Applying these concepts here, the court finds  insufficient evidence to support a finding that Mr. Sculley had title to and was owner of the boat under either subsection (a) or (b):  There is no evidence that the *Sculley 60* was identified to a contract between Sculley Boatbuilders and Mr. Sculley individually so as to trigger subsection (b), and  there is no evidence that a "document of title," purporting to cover the *Sculley 60*, was issued by Sculley Boatbuilders as "bailee" and delivered to Mr. Sculley as part of a purported title transfer.

As in *Jones,*  whatever value the original documents recorded by the Coast Guard might have as evidence of Mr. Sculley's  ownership, they do not constitute "documents of title" as that term is defined in the Florida UCC, and therefore  do not conclude the issue of ownership as a matter of law in  the  context  of  the  existing  summary  judgment  record,  which  reveals  competing  evidence suggesting that Sculley Boatbuilders Inc. was true owner of the vessel on the date Mr. Sculley signed the mortgage, including  (1) a second "builder's certification and first transfer of title" filed with the

NVDC five months later (July 12, 2003) describing Sculley Boatbuilder's Inc. as the owner and "party for whom built" with "first sale or transfer" of vessel to Juanillo Corporation; (2) Juanillo's subsequent transfer of title back to Sculley Boatbuilders Inc.; (3) identification of Sculley Boatbuilders as owner of the vessel on various bank documents, including the original note, security agreement and hypothecation agreement, as well as the loan modification agreement.

### B. Bank Malfeasance as Basis for Equitable Subordination of Mortgage Lien

Sunfish has alternatively pled, in affirmative defense, that the bank's claimed priority mortgage interest, if any, should be subordinated to Sunfish's ownership interests because the bank's reckless lending practices resulted in damage to it as a subsequent bona fide purchaser for value.

Originating in bankruptcy law, the purpose of equitable subordination is to undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors." *In re Kansas City Journal-Post Co.,* 144 F.2d 791, 800 (8th Cir. 1944). To state a claim for equitable subordination, a claimant must show (1) that the respondent engaged in some type of inequitable conduct, and (2) that the misconduct resulted in injury to creditors/claimants or conferred an unfair advantage on the respondent. Inequitable conduct is regarded as a wrong or unfairness, or "at the very least, a masquerade of something for what it is not," *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997), and typically falls into one of the following categories: (1) fraud, illegality, or breach of fiduciary duties (2) undercapitalization; or (3) a creditor's use of the debtor as mere instrumentality or alter ego. *Lischultz* at 344-45.

In the present case, Sunfish alleges that the bank acted inequitably by granting the original loan to Mr. Sculley using the *Sculley 60* as collateral, where it knew that the vessel did not bear an

affixed HIN, in violation of Coast Guard regulations, and where it later extended the loan for an additional five years, ostensibly for purpose of assisting Mr. Sculley resolve his financial issues, despite his obvious inability to make the final balloon payment due under original note, his escalating debt, tax liens and tightening circle of financial wolves. As Sunfish views it, the bank was largely uninterested in Mr. Sculley's financial health and was primarily motivated by a desire to avoid reporting the loan as defaulted in order to advance its own economic position.

The court recognizes that the level of egregious conduct necessary for equitable subordination is quite high, and that simple negligence in bank lending practices has been held insufficient to justify invocation of the doctrine to subordinate an otherwise valid preferred ship mortgage. *Maryland National Bank v Madame Chapel*, 46 F.3d 895, 901 (9th Cir. 1995). Generally, equitable subordination has been limited to cases where a creditor is an insider or manager of the debtor, or where the creditor has exercised substantial control over the debtor. Although the bank's relationship with Mr. Sculley does not appear to full into one of these categories, this does not necessarily eliminate the possible subordination of its lien. *See e. g. In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1362 (1st Cir. 1992); *In re Osborne*, 42 B. R. 988, 996-97 (W.D. Wis. 1984)(equitable subordination directed based on lender's misrepresentations to another creditor about debtor's prospects for payment; while lender knew debtor was struggling and likely unable to pay creditors, lender encouraged them to continue dealing with debtor, thus improving its own prospects for payment).

The court concludes, at this juncture, there is insufficient evidence of gross malfeasance to subordinate the bank's claim as a matter of law, but finds that Sunfish has presented sufficient evidence, through prior proceedings before this court and the instant summary judgment proceeding,

to allow the defense to remain viable for trial.  This record includes evidence that:  (1) the bank was aware from outset that vessel did not have permanently affixed HIN; (2) the  bank was aware that Sculley Boat Builders was the true owner of vessel, yet created a mortgage document describing James Sculley as the  sole owner of  vessel and sole maker/signatory on the mortgage; (3) the  bank granted the original mortgage in reliance on an outside marine survey commissioned prior to the loan application by Mr. Sculley;  (4) the bank unjustifiably extended the loan  for five additional  years, following Mr. Sculley's default on final  $880,000 balloon payment and history of late payments; without inspection or reevaluation of the vessel and without proof of insurance; (5) the bank's deliberate ignorance or disregard of numerous red flags raising grave creditworthiness of the debtor at the time of loan modification; and (6) the bank's correction of the note to reflect Sculley Boatbuilders, Inc. as a party to the note and owner of the collateral, and concomitant failure to correct the mortgage document.  On this evidentiary predicate, the court finds sufficient facts to create a genuine issue of material fact on question of whether the bank's lending misconduct justifies equitable subordination of its  lien.[8]

---

[8]*See Cantieri Navali Riuniti v. M/V Skyptron*, 621 F. Supp. 171, 187 (W.D. La. 1985), quoting the following excerpt from G. Gilmore & C. Black's treatise:

> Assume that a mortgagee knows that his mortgagor is insolvent and also knows that the mortgagor, if he continues to operate the vessel, will necessarily run up large bills for supplies and repairs which he will be unable to pay in the ordinary course of business.  If under such  circumstances, after default, the mortgagee  allows the mortgagor to continue his operations, there would be good reason to hold that the mortgagee had lost its priority over the post mortgage liens .  It would make no difference whether the result was rationalized in terms of laches (the prejudice to the lienors is sufficiently obvious) or in terms of subordination  on equitable principles.

Gilmore & C. Black, §9-84.

## IV.  Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

The bank's motion for summary judgment [DE# 49] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 13th day of February, 2011.

Daniel T. K. Hurley
United States District Judge

cc.  All counsel