## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 11-80692-CIV-HURLEY

**BRANCH BANKING & TRUST CO.**
**of VIRGINIA,**

      **Plaintiff,**

**vs.**

**M/Y "BEOWULF," Official No. 1137719,**
**etc.,** *in rem*,

      **Defendant.**

_____/

### <u>MEMORANDUM OPINION & FINAL JUDGMENT</u>

      This is an *in rem* admiralty action to foreclose a first preferred ship mortgage claimed by plaintiff  Branch Banking & Trust Co. of  Virginia ("the Bank") on the defendant vessel, the M/Y Beowulf ("the Beowulf" or "the vessel").  The mortgage was given as security for a  $1 million personal loan funded by the Bank in favor of James C. Sculley (now deceased), past President of Sculley Boatbuilders, Inc., the North Carolina corporation which built the vessel.

      Shortly after Mr. Sculley executed  the mortgage, Sculley Boatbuilders assigned a second identification number to the  vessel, secured a second, different official number from the United States Coast Guard, documented the vessel under a different name and sold it to a third-party purchaser for value, all  without notice to the Bank.  This fraud gives rise to the present controversy, in which Sunfish Marine Ventures, Ltd. ("Sunfish") claims a competing ownership interest in the Beowulf as a subsequent innocent purchaser for value.

      Sunfish contends that the Bank's mortgage is not a valid preferred ship mortgage under the Ship Mortgage Act, 46 U.S.C. § 31301 *et seq*., and that even if it is, grossly negligent and reckless

lending practices of the Bank permeating the Sculley loan should cause this court to rank the Bank's

mortgage below the interest claimed by Sunfish under the doctrine of equitable subordination.

A bench trial was conducted on these claims on April 16, 2012 through April 18, 2012.  After

consideration of  the evidence, arguments of counsel, trial memoranda and the applicable law, the

court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P.

52(a).

## I. Findings of Fact

1. Sculley Boatbuilders, Inc. ("Sculley Boatbuilders") is a  North Carolina corporation with

headquarters in Wanchese, North Carolina.  The company specializes in the production of custom

sportfishing  yachts.

2.  On December 1, 2002, at a joint meeting of its stockholders and directors, James C.

Sculley was elected President of Sculley Boatbuilders and Bonnie L. Hickie was elected Secretary

and Treasurer.  At that time, the corporation also authorized Ms. Hickie to pursue a $1,000,000.00

loan through Coastal Financial Corporation, a mortgage brokerage company, using "Hull # 3" as

collateral.[1]

3.  "Hull # 3" referred to a 60-foot sport-fishing vessel,  the "Sculley 60'," which was then

under construction.

4.  Coastal Financial Corporation brought Mr. Sculley, as a new customer, to the Bank  at its

Virginia Beach-Pembroke branch location.  In late December, 2002, Mr. Sculley applied for a

$1,000,000.00 personal loan from the Bank to be secured by a vessel as collateral.

---

[1]Minutes of the Annual Meeting of the Board of Directors and Stockholders of Sculley
Boatbuilders, Inc. held December 1, 2002 [Claimant Exhibit No. 1].

5. At the outset, Mr. Sculley completed a "Retail Loan Application" on a form supplied by the Bank. This form described the proposed collateral as a "2003 Sculley Boatbuilders 60 Ft."[2] Although this form is dated December 22, 2002, Mr. Sculley did not sign the application until January 17, 2003, the day on which the loan closed.

6. In further support of his application, Mr. Sculley submitted a "personal financial statement to the Bank."[3] Like the loan application, this form had a typed date of December 20, 2002, but it also included a handwritten date of January 17, 2003 next to Mr. Sculley's signature.

7. After collecting this preliminary financial data from Mr. Sculley, the Bank's loan processor, Kathy Harrell, generated a "BB&T Retail Loan Presentation" ("Loan Presentation).[4] This report was signed by Ms. Harrell, who approved the loan on January 16, 2003, and by R. B. Edwards, the bank's Direct Retail Lending Risk Manager, who co-approved the loan at time of

---

[2]The application listed Mr. Sculley's monthly income as $26,435.75, and referenced the first name of an illegible co-applicant (in type) earning an income of $24,632.09. It did not supply any other identifying or historical data regarding the co-applicant, and was signed only by Mr. Sculley. The application further listed $284,666.00 in cash assets and $7,768,969.00 of stock held in closely held corporations. A single liability, $1,000,000 in real estate loans, was reported. Mr. Sculley's credit report, however, showed outstanding real estate loans valued at over $2,000,000.00 (twice the amount shown on the application), as well as $175,000 in outstanding debt (not shown on the application), a $17,000 credit card dispute (not shown on the application) and a $160,000.00 credit line from Ibernia Bank (not shown on the application).

[3]On this form, Mr. Sculley reported $317,229.00 in salary, $29,339.04 in interest and $266,306.04 in "other income," bringing his aggregate income to $612,674.08 for calendar year 2002.

[4]This form reported Mr. Sculley's monthly debt/income ratio, as of December 20, 2002, at $12,454.00/$36,437.50, significantly less income than the roughly $600,000.00 per annum claimed on his financial statement .

3

closing.[5]

8.  By early January, 2003, Sculley Boatbuilders had completed construction of the Sculley 60' and assigned it Hull Identification Number ("HIN") GIJ60001A303.

9.  Around the same time, Mr. Sculley commissioned Harbour Marine Services, Inc. ("Harbour Marine") to perform a survey on the Sculley 60'.  On January 8, 2003, Edward Harbour of Harbour Marine provided the Bank with a survey of the "2003 Sculley Custom 60' Sportfisherman" (the "Sculley 60'), HIN GIJ60001A303, reporting the value of the vessel at $2,375,000.00.

Both parties agree that the vessel surveyed by Mr. Harbour is the vessel now known as the M/Y Beowulf.

10.  Although Coast Guard regulations require vessel manufacturers to permanently affix a Hull Identification Number ("HIN") on all vessels which they build,[6] Sculley Boatbuilders did not

---

[5]Ms. Harrell is now deceased and there is no recorded testimony from this individual before the court.

From the evidence presented at trial, the court infers that she began processing Mr. Sculley's loan application on December 20, 2002, the typed date on the application which also corresponds to the date that the credit bureau report was generated.

Although the presentation shows a date of 1/7/03 next to the signature of Mr. Edwards, there is no evidence that Mr. Edwards, as the Bank's managing agent,  signed off on the loan before Ms. Harrell.  It is more likely, and the court infers, that the 1/7/03 date found next to Mr. Edwards signature is a scrivener error for "1/17/03."

[6]Federal regulations governing United States Coast Guard oversight of navigation and navigable waters require boat manufacturers and importers to identify each boat produced or imported with primary and secondary hull identification numbers, consisting of twelve identifying characters, which are "permanently affixed" in accordance with 33 C.F.R. §181.29.  See 33 C.F.R. §181.23; 33 C.F.R. §181.25.

affix a  HIN to the Sculley 60.'  The Harbour survey placed the Bank on notice of this lapse, but the Bank nonetheless funded the Sculley loan without requiring Mr. Sculley to comply with the federal regulations.

11.  In addition to the failure to affix the HIN,  the Harbour survey noted  different engine numbers from those referenced in the Bank's Loan Presentation. It also referenced the owner's intent to place  the vessel in the upcoming Miami Boat Show.  Further, the survey noted the builder's intent to install a custom fishing tower on the boat at an estimated cost of  $75,000.00, and to add an electronic package at the option of the "buyer."

12.  Relying on the testimony of Dean McBrayer, the Bank's designated Rule 30(b)(6) corporate representative, the court finds that the above reference to the Miami Boat Show and contemplated addition of electronics at the buyer's option establish  that Mr. Sculley  was effectively seeking  a "floor plan loan" (a loan to finance the purchase or construction of inventory intended for sale to other people) in January of  2003.  In other words,  Mr. Sculley appeared to be pursuing a corporate objective of obtaining financing in anticipation of an eventual sale of the vessel.

13.  Before the Bank would fund the loan, it required a corporate resolution from Sculley Boatbuilders authorizing Mr. Sculley to pledge corporate property, and specifically the Sculley 60', as  collateral for Mr. Sculley's personal indebtedness and obligations.  An undated document found

---

33 C.F.R. §181.29(c) provides:

Each hull identification number must be carved, burned, stamped, embossed, molded, bonded or otherwise permanently affixed to the boat so that alteration, removal or replacement would be obvious.  If the number is on a separate plate, the plate must be fastened in such a manner that its removal would normally cause some scarring or damage to the surrounding hull area.  A hull identification number must not be attached to parts of the boat that are removable.

in the Bank's loan file, captioned "Certificate of Corporate Resolution and Authorization to Borrow" [Bank Form No. 1477VA], purports to memorialize this event.  This form was signed by Mr. Sculley, claiming to act in capacity as both President and Secretary of Sculley Boatbuilders.[7]  By affixing his signature to this document, Mr. Sculley clearly acknowledged the Sculley 60' as corporate property.

14. The Bank closed the Sculley loan on January 17, 2003.  The loan documentation executed on that date consisted of:  (1) a Retail Note and Security Agreement ("the promissory note"); (2) a First Preferred Ship Mortgage ("the mortgage"); (3) a Retail Security Agreement ("the security agreement"); (4) a Hypothecation Agreement ("the hypothecation agreement"), and (5) an "Agreement to Provide Accidental Physical Damage Insurance" ("the insurance agreement").

As detailed below, these documents contained glaring inconsistencies regarding ownership of the collateral used to secure the Sculley loan.  The note (in one place) and mortgage referred to James C. Sculley, individually, as owner of the collateral, while the note (in another place), the security agreement, and the hypothecation agreement all listed Sculley Boatbuilders, Inc. as the owner of the vessel.

---

[7]Mr. Sculley was not the  Secretary of  Scully Boatbuilders, Inc. when he signed the "Certificate of Corporate Resolution and Authorization to Borrow."  The Bank knew or should have known that Mr. Sculley had falsely held himself out as such when he signed this form, since it also had before it minutes from the  December 1, 2002 Annual Meeting of the Board of Directors and Stockholders of Sculley Boatbuilders, Inc. showing the election of James Sculley and Bonnie Hickle as President and Secretary of the corporation, respectively, on that date [Claimant Ex. No. 1].  Notably, the signature block on this form designates an area for affixation of the corporation's seal or imprint, but the document does not bear a corporate seal or imprint.

**(a). The promissory note**

In one place, the note executed by Mr. Sculley at closing indicated that he was the owner of the Sculley 60', the collateral used to secure the note. Specifically, on page 1, the note recited that Mr. Sculley was giving the Bank a security interest in certain personal property, as described in a separate agreement between the parties, to secure the note.

On page 2, however, under Mr. Sculley's individual signature, there is a reference to Sculley Boatbuilders as owner of the collateral. This language was added:

> The following owners of the vessel are signing this Note only for the purpose of granting a security interest there ans (sic) are not borrowers.
>
> Grantor of Security Interest: Sculley Boatbuilders Inc.

Mr. Sculley separately signed the addendum, this time designating himself as "Member" on behalf of Sculley Boatbuilders, Inc.[8]

---

[8]The pagination on the note indicated that it was a four-page document. Further, on page 2, just above the maker's signature, the note recited, "This contract is signed and accepted subject to the additional terms and provisions contained on pages 3 and 4 which are made part of this contract by reference." However, the Bank only introduced into evidence copies of pages 1 and 2 of the note at trial [Plaintiff Exhibit No. 1]. The Bank's collections manager, Anna Marie Potter, testified that she retrieved these copies from the bank's computer system, but did not find pages 3 and 4 of the note stored in that depository. She identified pages 3 and 4 of the standard note form in effect at the time the Sculley loan was made (Form No. 1491VA (0208)), and these pages were introduced as exemplars of the form in use by the Bank in this general time period [Plaintiff Exhibit No. 2].

Ms. Potter further testified that while the Bank normally stores originals of instruments such as promissory notes and other loan documentation in its vault, a physical search of the vault conducted at her direction did not turn up the original Sculley note or any other Sculley loan documents. She had no explanation for the disappearance of the original Sculley note from the vault, and no explanation as to why pages 3 and 4 of the note were missing from the Bank's computer-stored images of the document.

As further noted by claimant's lending expert James Meere, there is a blank space in the designated area for buyer's initials under the "optional credit insurance" block shown on

**(b). The mortgage**

The mortgage was made by James C. Sculley, designated in this instrument as "Sole Owner(s) of the vessel" being mortgaged to secure a $1,000,050.00 promissory note made by James C. Sculley on January 17, 2003. The specific vessel "mortgage[d] and convey[ed]" by this instrument was described as the "Sculley 60'," a "2003 60' Sculley 60," HIN GIJ60001A303. On page three, the mortgage was signed solely by "James C. Sculley," as designated "Owner."

Underneath Mr. Sculley's signature on the mortgage appears a partially complete notary signature block, with the handwritten name of "Mark Delaney" shown as the notary public before whom James C. Sculley allegedly appeared and took an oath.[9] Although the notary block includes a handwritten date of January 17, 2003 along with what purports to be the signature of Mr. Delaney, the space for the "notary seal" is blank, and the notary acknowledgment on the form does not indicate whether the notary knew Sculley, or the method of identification he used to verify the identity of the signatory. [10]

---

page two of the note introduced at trial [Plaintiff Ex. No. 1], while the copy of the note attached to the Bank's complaint [DE# 1-1] shows a script of the borrower's initials in this space, "JCS," suggesting that original document may have been altered, at least in this respect, at some time after closing.

[9]The claimant's marine lending expert, James Meere, testified, and the court accepts his testimony as credible, that Mark Delaney is an officer or agent of Coastal Financial Corporation, he mortgage brokerage company which was actively involved in procuring and closing on the Sculley loan. The involvement of Coastal Financial in this transaction is evident from Mr. Delaney's participation in the closing, and the words "Coastal Financial" found imprinted in fax transmission data running across the top of several documents in the Bank's loan file.

[10]The parties stipulated that the mortgage contains all of the information recited above [Joint Pretrial Stipulation, ¶¶ 11-16], and further that "the mortgage is signed and acknowledged."[Stipulation ¶17]. At trial, Sunfish sought to withdraw Stipulation ¶17,

8

**(c).  The security agreement**

The security agreement identified "Sculley Boatbuilders Inc." as  "Owner(s)" of the "2003 Sculley  60' Sport  Fisherman Vessel, HIN GLJ60001A303" serving as collateral for Mr. Sculley's loan. This instrument indicated that Sculley Boatbuilders, Inc., as "owner," granted the Bank a

---

concerning acknowledgment of the mortgage, or alternatively to reserve its right to challenge the validity of the notary acknowledgment as a matter outside the factual parameters of this stipulation.

In the latter regard, Sunfish argued that the stipulation was intended to signify merely its recognition that the document contained a signature and an acknowledgment, not its assent to the validity of the acknowledgment or genuineness of the signature, which it wishes to now contest due to the absence of a notary seal, and the notary's failure to indicate the method by which the signatory presented for identification.

Sunfish urged that the acknowledgment defect was essentially uncorrectable, since a notary may not amend a certificate of acknowledgment without re-acknowledgment by the parties.  Thus, it argued there could therefore be no prejudice to the Bank by allowing Sunfish to contest the validity of the acknowledgment, since Mr. Sculley is now dead, and there are no other witnesses or other evidence available to the Bank  through  which it might have attempted to correct the error.

The court denied Sunfish's request to withdraw Stipulation ¶17 at trial, concluding that the joint stipulation constituted a waiver of any objections Sunfish may have had to validity of the signature or its acknowledgment.  The court reaffirms this ruling here.

Further, the court alternatively holds that the acknowledgment substantially complies with the requirements of Florida law, the stipulated controlling law,  and hence is not fatally defective for failure to include either the seal or a specified mode of signatory identification. While re-acknowledgment of a defective acknowledgment is required  in some cases, if the intention of the parties to a mortgage is clear from the document when construed as whole, clerical and technical errors should be disregarded. *See In Re Henry*  200 B.R. 59 (M.D. Fla. 1996) and cases cited *infra*.

Applying this precept here, the court finds omission of the mode of signatory identification and failure to affix the notary seal are clerical errors which do not affect the rights or obligation of parties to the mortgage or validity of the mortgage document itself. *Compare  In re Sunnafrank*, 456 B.R. 885 (S.D. Ohio 2011)(mortgage not defective and ineligible for recording simply because seal of notary public who acknowledged it did not appear on it); *In re Robinson*, 403 B.R. 497 (S.D. Ohio 2008)(acknowledgment of mortgage not defective because of notary failure to inscribe name on seal or print or stamp name near signature; even if defective).

security interest in the Sculley 60' to secure  obligations assumed by James C. Sculley under the January 17, 2003 promissory note.

James C. Sculley signed this document in two places, first as "owner," on behalf of Sculley Boatbuilders, Inc., and then again as "borrower owner."

**(d).  The hypothecation agreement**

Sculley Boatbuilders Inc. executed a hypothecation agreement by which it unconditionally pledged all of its interest in the Sculley 60' and her engines, as "collateral security' for the $1,000,050.00 note made by James C. Sculley on January 17, 2003.  This  instrument was signed by James C. Sculley, as "Member" on behalf of "Sculley Boatbuilders Inc."

**(e).  The insurance agreement**

The insurance agreement identified "James C. Sculley" as "Insured," and required  him to "continuously insure against loss or damage to the collateral" at his own expense during the term of the loan.  This form contained  a signature block for execution and seal by the "Borrower," but was not executed by Mr. Sculley or Sculley Boatbuilders.  Instead, on the signature line for "borrower" appear the typed words  "SIGNATURE NOT REQUIRED" [Claimant Exhibit No. 9].

15.  As part of the closing, the Bank loaned Mr. Sculley the sum of $1,000,050.00.

16.  As a condition of the loan, the Bank required that Mr. Sculley apply for a "Certificate of Documentation"[11] from the Coast Guard and have the bank's security interest noted on it. Accordingly, on the day of closing, Mr. Sculley signed an  "Application for Initial Issue, Exchange

---

[11]"A Certificate of Documentation is required for the operation of a vessel in certain trades, serves as evidence of vessel nationality, and permits a vessel to be subject to preferred mortgages." 46 C.F.R. § 67.120, § 67.1.

or Repayment of Certification of Documentation; Re-documentation," seeking United States Coast Guard documentation for the Sculley 60' at the vessel's hailing port in Wanchese, North Carolina. He also supplied a "Builder's Certificate" as proof of title.

17.  In the application for initial issue of certificate of documentation, Mr. Sculley identified the vessel for which documentation was sought as the "Sculley 60'," HIN GIJ60001A303, and listed himself as "managing owner" of the vessel.  He signed the application as "James C. Sculley," the "sole owner" of the vessel.

18.  In the accompanying "builder's certificate and first transfer of title," completed on Coast Guard form CG-1261, Mr. Sculley identified himself as the "party(ies) for whom built," and certified that he had personal knowledge of the facts recited in the form, "acting in [his] capacity as President of Sculley Boat Builders."

However, the "acknowledgment" block found at Section "X" of the builder's certificate, expressly designated for completion by a "notary public or other official authorized by a law of a State or the United States to take oaths," was left blank.

19.  Mr. Sculley did not supply, and the Bank did not require, a "manufacturer's statement of origin," or "MSO," to corroborate Mr. Sculley's claim of ownership of the vessel prior to closing.[12]

---

[12]"A Manufacturer's Certificate of Origin means a certificate issued under the law or regulation of a State, evidencing transfer of a vessel from the manufacturer ...to another person." 46 C.F.R. §67.120, §67.3.

According to claimant's marine lending expert, James Meere, lenders ordinarily insist upon both a builder's certificate and a manufacturer's certificate before accepting a vessel as collateral for a loan, and typically store the original MSO in a vault until the loan is paid in full, a security measure designed to prevent the borrower from taking the MSO to another

20.  Mr. Sculley did not supply, and the Bank did not require, a written sales agreement or bill of sale memorializing a transfer of title from Scully Boatbuilders to Mr. Sculley.

21.  Through Coastal Financial Corporation, on February 3, 2003, the Bank caused submission of Mr. Sculley's application for initial issue of certificate of documentation to the United States Coast Guard National Vessel Documentation Center (NVDC), along with the builder's certificate as proof of title.

22.  Through Coastal Financial Corporation, on February 3, 2003, the bank also caused its mortgage to be recorded with the National Vessel Documentation Center (Book 03-28, page 229).[13]

As indicated above, the mortgage identified Mr. Sculley, individually, as sole maker of the mortgage and sole owner of "100% of the interests in the vessel ....being mortgaged ... to secure a promissory note made by James C. Sculley ... dated January 17, 2003, in the principal amount of $1,000,050.00..."

23  On March 27, 2003, the Coast Guard issued a Certificate of Documentation for the Sculley 60', HIN GIJ6000A303, assigning it Official No. 1137719.  This certificate identified James C. Sculley as both "owner(s)" and "managing owner" of the vessel

24.  A few months later, on June 12, 2003, Sculley Boatbuilders, Inc., prepared a "Builder's Certificate and First Transfer of Title" for a vessel to which it assigned the same HIN as that

lender to shop for a second loan collateralized by same vessel.

[13]Documents subpoenaed from Coastal Financial Corporation show that these documents were forwarded to the Coast Guard's Naval Vessel Documentation Center under cover of an undated letter from Coastal Financial Corporation signed by office manager Lori Watson, along with a $145 recording fee [Claimant Exhibit No. 55].

previously assigned to the Sculley 60', HIN GIJ60001A303.  This certificate identified the vessel for which documentation was sought as the  "ECO," and documented a "first sale or transfer of vessel" to "Juanillo Corporation" in Sabana Seca, Puerto Rico.

Unlike the initial "Builder's Certificate and First Transfer of Title," prepared by Sculley Boatbuilders in connection with its application for initial issue of certificate of documentation on the Sculley 60', HIN GIJ60001A303, the Juanillo builder's certificate identified "Sculley Boatbuilders, Inc." as the party for whom the vessel bearing this HIN was built.  This certificate was signed by James Polatty, the General Manager of Sculley Boatbuilders, Inc., and contained a fully completed jurat and notary public acknowledgment block dated June 12, 2003, bearing the signature and seal of notary public Christine Etheride Walker.

25.  On June 18, 2003, Edgar Figueroa, as President and on behalf of Juanillo Corporation, signed a corresponding application for initial issue of certificate of documentation for a vessel identified as the "ECO," bearing HIN GIJ60001A303.  On June 22, 2003, Sculley Boatbuilders submitted this application on behalf of Juanillo Corporation to the Coast Guard's National Vessel Documentation Center, together with a bill of sale and builder's certificate as proof of ownership.

26.  On September 23, 2003, Sculley Boatbuilders, through James Polatty, General Manager, sent a letter to the Coast Guard claiming that the company had mistakenly duplicated the issuance of HIN GIJ60001A303 on the ECO.  Mr. Polatty asked the Coast Guard to correct the HIN listed on Juanillo's application for certificate of documentation to reflect a new HIN of "GIJ60003D303," and to issue a new official number for the ECO.

27.  The Coast Guard complied with Polatty's request without further inquiry, and inscribed

13

a handwritten "corrected" HIN of  GIJ6000<u>1D303</u> [apparently a scrivener error for the requested GIJ6000<u>3D303</u>] on Juanillo's application for initial issue of certificate of documentation, and on  October 6, 2003, issued a certificate of documentation for the ECO at its hailing port in Puerto Rico, with assigned HIN GIJ60003D303 and  Official No. 1148420.

28.   On January 1, 2005, Juanillo Corporation transferred the ECO back to Sculley Boatbuilders Inc.  This was  memorialized by a  "Transfer of Interest" filed  with the National Vessel Documentation Center on February 3, 2006.

29.  On January 30, 2006, Sculley Boatbuilders sold the ECO to Forest Stream Sportfishing LLC, as evidenced by a Bill of Sale executed by James Polatty as General Manger for Sculley Boatbuilders, Inc. on that date.

30.   On February 3, 2006, Forest Stream Sportfishing LLC submitted an application for initial issue, exchange or replacement of certificate of documentation for the ECO to the National Vessel Documentation Center, supported by a notarized bill of sale as proof of title.  This application requested a name change on the vessel, from the "ECO" to the "EVANS B."  The National Vessel Documentation Center granted this request and issued a certificate of documentation for the "EVANS  B," identifying Forest Stream Sportfishing LLC as owner.

31.   Approximately two years later, on January 21, 2008, Mr. Sculley defaulted on the $863,378.90 balloon payment then due under the note.  In February, 2008, he applied to the  Bank for a modification of the note and extension of the loan term.  In support of his request, on February 14, 2008, he  submitted a personal financial statement listing his net worth as of  December 31, 2007 at  $14,055,785.00, with mortgage liabilities reported at $3,066,272.00 [Claimant Exhibit No. 25].

He later submitted another personal financial statement on a Bank form which listed his net worth as of February 20, 2008 at $435,500.00, with no mortgage liabilities reported [Claimant Exhibit No. 29].

32. Despite Mr. Sculley's default on the balloon payment, following a history of multiple late payments under the original note and updated financial data showing that his reported net worth had plummeted from $11,339.635.00 (in 2003) to $435,000.00 (in 2008); that he incurred outstanding tax liens for $226,000.00 and $159,000.00; that his Beacon score dropped from 751 to 673; that his debt to income ratio had grown to 157% [meaning that for every $100,000.00 of income generated he incurred $157,000.00 in debt], and that his accounts payable went from $0 in 2002 to $1,300,000,00 in 2008---the bank agreed to an extension of the loan.

33. Accordingly, on February 28, 2008, the Bank and Mr. Sculley entered into a retail note modification agreement note extending the time for repayment for an additional five years with an increased interest rate.[14]  Significantly, the modified note identified James S. Sculley, individually, as the maker and "Borrower," while it described Sculley Boatbuilders, Inc. and Sculley Boatbuilders as "grantor(s)" and "owners ...of any property designed to secure performance of Borrower's obligations to the Bank."  This instrument was signed twice by James Sculley, first as individual "borrower," and second as "grantor" on behalf of Sculley Boatbuilders, Inc.

34. Before agreeing to the modification, the Bank was aware it did not have a current valuation of the collateral.  Nonetheless, it did not reevaluate the value of the vessel serving as

---

[14]Under the modified note, Mr. Sculley was obligated to make 58 monthly payments of $8,252,63, beginning March 28, 2008, with a balloon payment of $692,249.12 falling due on January 28, 2013.

collateral, did not require proof of insurance on the collateral, and did not conduct a physical inspection or otherwise take any steps to ensure that the vessel still existed and remained under Sculley's control at that time. Instead, the Bank assumed the same value for the collateral as that fixed by the then five–year old Harbour survey, and, despite Mr. Sculley's financial free-fall, extended the term of the loan along with its security interest in the collateral for an additional five years.

35. The Bank also took a significant corrective action at the time of loan modification: It corrected the name of the owner on its "collateral tab" to Sculley Boatbuilders, Inc., and drafted the note modification agreement accordingly to identify Sculley Boatbuilders and Sculley Boatbuilders, Inc. as "owner(s)" of the collateral designated to secure the borrower's performance of the modified note.

36. The Bank, however, did not take any steps to make a corresponding correction to the mortgage document.

37. The Bank's decision to modify the loan was the product of egregious, reckless lending practices. [15]

38. Relying on the expert testimony of James Meere, which the court accepts as credible, the court finds that the Bank's failure to declare a default in February 2008 resulted from institutional pressures against allowing a loan of this magnitude to run into a sixty-day default stage, thereby triggering reporting requirements and other accounting and regulatory fall-out detrimental to the financial well being of the Bank.

---

[15]The Bank's attorney stipulated during trial that the Bank did not follow good banking practices in making the Sculley loan.

16

39.  The court further finds, based on the unrebutted expert testimony of Mr. Meere, that the debt-to-income ratio of Mr. Sculley in February, 2008 alone justified an automatic rejection of Mr. Sculley's request for an extension of the loan, and that the Bank's decision to extend the term of the loan for five years, in the face of the debtor's then rapidly tightening financial vice, reflects irresponsible, grossly reckless, egregious lending practices undertaken for the sole purpose of protecting the Bank's own financial interests to the foreseeable detriment of future creditors of the debtor and lienors and/or purchasers of the collateral.

40.  Moreover, by failing to reevaluate the collateral, confirm its existence, or insist on proof of insurance, and agreeing to extend the term of Mr. Sculley's loan for an additional five years in lieu of declaring a default – despite the fact that Mr. Sculley was by then clearly teetering on the edge of bankruptcy – the Bank effectively allowed Mr. Sculley to bury the fraud which he had orchestrated via assignment of two different HINs to the same vessel, all to the foreseeable detriment of future purchasers and lienors of the collateral.  At the same time, the Bank obtained an unjustified extension of its rights in the vessel for an additional five years.

41.  At or about this same time, in early 2008, William Hodges, the principal of Sunfish Marine Ventures Ltd. ("Sunfish") expressed an interest in the purchase of the "EVANS B" from Forest Stream Sportfishing, LLC.  To facilitate the sale, Mr. Hodges requested a survey on the vessel from Florida Detroit Diesel-Allison, the Florida subsidiary for the engines' manufacturer, and retained the services of maritime attorney Steven Hibbes.

Florida Detroit Diesel-Allison issued its survey on March 20, 2008 showing an "Assembly No" ( HIN) for the "EVANS B" of GIJ60001A303, matching the original HIN assigned to the

Sculley 60' by Sculley Boatbuilders in 2003.

42.  On April 15, 2008, Forest Stream Sportfishing LLC sold the "EVANS B" to Sunfish, evidenced by a Bill of Sale filed with the National Vessel Documentation Center on April 24, 2008. Sunfish renamed the vessel the "Beowulf" and registered her in the British Virgin Islands.

43.  Mr. Sculley died on June 1, 2009, and thereafter defaulted in his obligation to make timely payments under the retail note modification agreement.

44.  The Bank declared a default and filed this action on June 16, 2011, based on the court's admiralty jurisdiction, 28 U.S.C. §1333 and 46 U.S.C. §951 to enforce its claimed preferred ship mortgage pursuant to the Ship Mortgage Act of 1920, 46 U.S.C. § 911 *et seq*. and to collect on the outstanding debt owed by Mr. Sculley.

45.  The principal amount due to the bank, under the modified note, is $832,573.98, plus late fees of $975 and accrued interest.

## II. Conclusions of Law

### A.  Requirements for a Preferred Ship Mortgage

The Ship Mortgage Act of 1920 ("the Act") was intended to encourage investment in the shipping industry by providing greater security to mortgagees. To achieve this goal, the Act grants the holder of a preferred ship mortgage the right to proceed in admiralty with priority status over most maritime liens arising after perfection of the mortgage. *All Alaskan Seafoods, Inc. v. M/V Sea Producer*, 882 F.2d 425 (9th Cir. 1989); *Merchants Nat'l Bank of Mobile v. Ward Rig No. 7*, 634 F.2d 952 (5th Cir. 1981).

The statutory requirements for perfecting a preferred ship mortgage are set forth at 46 U.S.C. § 31322 (a), which defines a "preferred mortgage" as a mortgage that includes the whole vessel, is

filed in accordance with 46 U.S.C. §31321, and covers a documented vessel.[16]  In turn, under 46 U.S.C. § 31321, a ship mortgage must (1) identify the vessel; (2) state the name and address of each party to the instrument; (3) state, if a mortgage, the amount of the direct or contingent obligations that is or may become secured by the mortgage, excluding interest, expenses and fees; (4) state the interest of the guarantor, mortgagor or assignor in the vessel; (5) state the interest sold, conveyed, mortgaged or assigned; and (6) be signed and acknowledged. 46 U.S.C. §31321(b).

The parties in this case stipulated that the Sculley mortgage satisfied these requirements. Sunfish, however, contends that the mortgage is not entitled to preferred status under the Act because the underlying mortgage was itself invalid, and because the vessel was not properly "documented" at the time of the mortgage recording.

### B.  Validity of the Sculley Mortgage

Merely following the correct recording procedures prescribed by the Ship Mortgage Act does not automatically create a valid preferred mortgage entitled to priority. *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561 (5th Cir. 1986).  Instead, an admiralty court must turn to other sources to determine the validity of the underlying mortgage, including state law, other federal laws, and general principles of equity.  *Id.*, at 565, citing *Bergren v. Davis*, 287 F. Supp. 52 (D. Conn. 1968), citing Gilmore & Black, The Law of Admiralty 590 (1957); *J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815 (5th Cir. 1972); *Florida Bahamas Lines, Ltd. v. The Steel Barge 'Star 800' of Nassau*, 433 F.2d 1243, 1249-50 (5th Cir. 1970); *Cantieri Navili Riuniti v. M/V Skyptron*, 621 F. Supp. 171, 187 (W.D. La. 1985), *aff'd on other grounds*, 802 F. 2d 160 (5th Cir.

---

[16]A "documented vessel" means "a vessel which is the subject of a valid Certificate of Documentation." 46 C.F.R. §67.120, §67.3.

1986).

The validity of the underlying mortgage turns, in the first instance, on whether the mortgagor held legal title to the vessel at the time of execution and recordation of the mortgage. *C.I.T. Corp. v. Oil Screw Peggy*, 424 F.2d 767, 768 (5th Cir. 1970)(per curiam)("[n]othing in nature of the ship mortgage, nor in the terms of its statutory implementation, suggests that its lien should extend to what the mortgagor did not own and had no right to acquire."). This follows as a party has no power to convey a security interest in property which does not belong to him. *See generally Pennock v. Coe,* 64 U.S. 117, 23 How. 117, 1859 WL 10652, 16 L.Ed. 436 (1859); *Roberts v. Hart,* 573 So.2d 12 (Fla. 4th DCA 1990)(mortgage invalid where mortgagor did not own property at time he executed mortgage); *Wagner v. Roberts*, 320 So.2d 408 (Fla. 2d DCA 1975)(same), *cert. den.*, 330 So.2d 20 (1976); *Gonzalez v. Chase Home Finance LLC,* 37 So.3d 955 (Fla. 3d DCA 2010)(mortgagor can convey no greater interest in property than he owns). *See also United States v. One Parcel of Real Estate at 3229 S.W. 23d St., etc.*, 768 F. Supp. 340 (S.D. Fla. 1991)(mere execution of mortgage is not evidence of any ownership of mortgaged property under Florida law); *Pasekoff v. Kaufman*, 392 So.2d 971 (Fla.3d DCA 1981)(same).

The court recognizes that "the primary rule of construction of a mortgage is to ascertain the intention of the parties," *Huntington Nat'l Bank v. Merrill Lynch Credit Corp.*, 779 So.2d 396, 398 (Fla. 2d DCA 2000). Further, where multiple documents are executed contemporaneously with a mortgage and are part of the same transaction, all documents are read together to determine and give effect to the intention of the parties. *In re Alford*, 403 B.R. 123, 21 Fla. L. Weekly Fed. B 665 (M.D. Fla. 2009), citing *Boyette v Carden*, 347 So.2d 759, 761 (Fla. 1st DCA 1977). At the same time, as a rule of contract interpretation, parol evidence is generally not admissible to vary, contradict

or defeat the terms of a complete and unambiguous written instrument. *Id.* at 132. If a contract is ambiguous or obscure in its terms, extrinsic evidence may be considered to aid the interpretation, but, even here, under the "ambiguous transaction exception," the parol evidence must still be "consistent with, and not contrary to, such written instrument." *Id.*, citing *Florida Moss Products Co. v. City of Leesburg,* 93 Fla. 656, 112 So. 572, 573 (1927).

In this case, the mortgage on which the Bank relies to establish a preferred ship mortgage unambiguously identified James C. Sculley as "sole owner" of the collateral pledged to secure the Sculley note, thus precluding resort to extrinsic evidence, including other documents comprising the loan documentation, as a constructional aid in determining the parties' intent.[17]

Thus, it is upon this document that the Bank must proceed to establish its claimed priority status under the Act. Because the mortgage identified Mr. Sculley as sole maker and "sole owner" of the collateral pledged in the mortgage,[18] the Bank bears the burden of proving Mr. Sculley's ownership of the Sculley 60' as part of its burden of establishing the validity of the underlying mortgage and its claimed preferred ship mortgage status under the Act. *See C.I.T. Corp. v. Oil Screw Peggy*, 424 F.2d 767, 768 (5th Cir. 1970)(per curiam)(preferred ship mortgage did not attach to

---

[17] It is undisputed that the Bank did not record the hypothecation agreement, which identifies Sculley Boatbuilders as owner of the collateral and grantor of the security interest in the Sculley 60' used to secure the note. Because a ship mortgage must be recorded to be valid, 46 U. S. C. § 31321, and the hypothecation agreement clearly was not, the court need not wrestle with the implications which a recorded hypothecation agreement might have posed in determining the parties' competing priority claims in this case.

[18] The Bank did not seek a reformation, which generally will not be ordered against a bona fide purchaser for value, although many states allow reformation against judgment and execution creditors. *See In re McLean Industries, Inc*., 84 B.R. 340 (S.D.N.Y. 1988) and cases cited *infra*.

radar equipment leased by shipowner/mortgagor in which mortgagor did not have an ownership interest); *ITT Indus. Credit Co v. The  M/V Richard C.*, 617 F. Supp. 761, 764 (E.D. La. 1985)("It is further obvious that a [preferred ship] mortgage cannot attach to property not owned by the mortgagor"); *Chase Manhattan Financial Services, Inc. v. McMillian*, 896 F.2d 452 (10th Cir. 1990); *ITT  Indus.  Credit Co. v M/V Richard C.,*  617 F. Supp.761 (E.D. La. 1985).

The Bank agrees with this statement of law [Plaintiff's Proposed Conclusions of Law, ¶ 4][DE# 95], and contends that Mr. Sculley owned the Sculley 60' [n/k/a the Beowulf] as of January 17, 2003, the date he signed the mortgage [Plaintiff's Proposed Findings of Fact, ¶ 22][DE# 95].

State law defines what constitutes legal title to a ship for purposes  of establishing the validity of a preferred ship mortgage, as  contracts for the sale of  ships are not "maritime" and thus admiralty jurisdiction does not apply.  *See Chase Manhattan Financial  Services v. McMillian,* 869 F.2d 452 (10th Cir. 1990); *SC Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160, 164 (5th Cir. 1979), *cert. den*., 446 U.S.  918 (1980).

The parties agreed during trial that Florida law, as the law of the forum, drives the  title issue in  this case,  where  neither party has advanced  the application of the law of any other jurisdiction. *See National Ass'n of Sporting Goods Wholesalers, Inc. v.  F. T. L. Marketing Corp.,* 779  F.2d 1281 (7th Cir. 1985), citing  *Gonzalez v. Volvo of America Corp.,*  752 F.2d 295 (7th Cir. 1985)(where parties  fail to raise a possible conflict of substantive law, the substantive law of the forum controls). In their pretrial stipulation, the parties similarly agreed that  the laws of  Florida apply in areas where there is no applicable maritime law [Pretrial Stipulation,  Section VII] [DE# 87].  In their trial briefs, both advanced  the application of Florida UCC law as determinative of the  title issue.

The court accordingly turns to the substantive law of Florida, as stipulated by the parties, to

determine whether Mr. Sculley owned the Sculley 60' at the time he executed the mortgage.  *See Windward Traders, Ltd. v. Fred S. James & Co. of New York*, 855 F2d 814 (11th Cir. 1988)(applying state law by stipulation); *Casio, Inc. v.  S. M. & R. Co.,* 755 F.2d 528 (7th Cir. 1985)(unless court's subject matter jurisdiction is affected, parties may generally stipulate to the substantive law to be applied); *Cates v. Morgan Portable Building Corp.,* 780 F.2d 683 (7th Cir. 1985)(parties may impliedly stipulate to source of substantive law governing dispute).

In effort to prove that Mr. Sculley owned the vessel on the date of closing,  the Bank points to the builder's certificate and first transfer of title dated January 17, 2003, which identified  James C. Sculley as the "person for whom [the vessel was] built"[Plaintiff Exhibit No. 4], the corresponding application for initial issue of certificate of documentation, in which  Mr. Sculley again identified himself as owner of the Sculley 60' [Plaintiff Exhibit No. 5], and the Certificate of Documentation which the Coast Guard issued  in reliance upon those submissions which identified "James C. Sculley" as "Owner" and "Managing Owner" of the Sculley 60' [Plaintiff Exhibit No. 6]. None of these documents, however, constitutes conclusive evidence of  ownership. *Saint Paul Fire Marine Ins. Co. v.  Vest Transportation Co.,*  666 F.2d 932, 938 (5th Cir. 1981)(true ownership of a vessel not dependent upon its registry, as ownership question ordinarily governed by state law); *Hozie v. The Vessel Highland Light*, 182 F.3d 925, 1999 WL 313650 * 1 (9th Cir. 1999)(unpub)("Underwood did not become the legal owner of the ship when the Coast Guard issued a certificate of documentation..."); *Chase Manhattan Financial Services, Inc. v. McMillian,* 896 F. 2d  452 (10th Cir. 1990)(builder's certificate is *prima facie*, but not conclusive evidence of title because  it is part of  the  paperwork required  by the Coast Guard for the certification of documentation process); *C & C Boat Works, LLC v. Skansi Marine, LLC,* 2009 WL 361138 (E. D

23

La. 2009*); ITT Indus. Credit Co v.  M/V Richard C.*, 617 F. Supp. 761 (E.D. La. 1985).

Thomas Willis, former head of the National Vessel Documentation Center in Falling Waters, West Virginia, gave unrebutted testimony (via videotaped deposition)  that a "builder's certificate" is ordinarily accepted at "face value" by the Coast Guard as indicia of ownership, but does  not operate as  conclusive evidence of title.  Mr. Willis further testified that  the Coast Guard ordinarily will not accept a  security agreement, promissory note, note modification agreement or hypothecation agreement as proof of ownership (while noting that hypothecation agreements can be recorded if in proper form).  However, in an errata sheet, attached and incorporated into his deposition testimony without objection, Mr. Willis clarified  that if the National Vessel Documentation Center  had been aware in this case of the inconsistent representations of ownership concerning the Sculley 60' set forth  in  the  security  agreement,  promissory  note,  modification  agreement  and  hypothecation agreement,  it  would have questioned  Mr. Sculley's claim of ownership and would not have issued a certificate of documentation until the issue  was  resolved.

The  Bank  knew  about  these  contradictory  statements  regarding  ownership  in  the  loan documents, but took no action to investigate them.  In its trial briefing, the Bank  acknowledged that "references to Sculley Boatbuilders as the owner of the vessel in some of the banks (sic) documents seem inconsistent," but argued that these documents are not "relevant or material" to the issue of ownership [Plaintiff's Proposed Conclusions of Law,  ¶ 13].  Instead, it urged the court to infer the existence of a pre-closing  sale of the vessel from Sculley  Boatbuilders to Mr. Sculley based on Mr. Sculley's  conduct  pursuant to § 672.204(1), Florida Statutes, [19] apparently of the view that Mr.

_____

[19]Section 672.204(1), Fla. Stat. provides, "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the

24

Sculley recognized the existence of such an implied contract by affixing his signature to the builder's certificate and participating in the loan process on behalf of Sculley Boatbuilders [Plaintiff's Proposed Conclusions of Law, ¶¶ 17, 18]. [20]

The court disagrees. Standing alone, without contradictory statements of ownership revealed in other contemporaneously created documents, the builder's certificate might well be relied upon as adequate evidence of title. However, in this case, glaring inconsistencies about ownership found throughout the loan documentation raise the opposite inference from that urged by the Bank.

Because the Sculley 60' constitutes "goods" within the meaning of Florida's Uniform Commercial Code (UCC), *J.K Jones v. One Fifty-Foot Gulfstar Motor Sailing Yacht, Hull No. 01,* 625 F.2d 44 (5th Cir. 1980); *Northern Ins. Co. of New York v. 1996 Searay Model 370DA Yacht,* 453 F. Supp. 2d 905 (D. S. C. 2006), the issue of legal title in this case is necessarily resolved by determining whether a "sale" of the vessel from Sculley Boatbuilders to Mr. Sculley occurred prior to the time of execution of the mortgage. *See e.g. Equipment Leasing LLC v. Three Deuces, Inc.,* 2011 WL 3268197 (E.D. La. 2011).

Article 2 of the UCC, as adopted in Chapter 672, Florida Statutes, applies to all transactions in goods. § 672.102, Florida Statutes. Because the Sculley 60' meets the definition of "goods" contained in § 672.105, the statute of frauds provided in Article 2 of the UCC, §672.201, requiring "some writing sufficient to indicate that a contract for sale has been made" for contracts for the sale

existence of such a contract."

[20]The Bank acknowledged that "there is no written contract between Sculley Boatbuilders and Mr. Sculley" [Proposed Conclusions of Law, ¶17].

25

of goods valued at $500 or more, applies.[21]  *See generally H.P.B.C. , Inc. v. Nor-Tech Powerboats, Inc.*, 946 So.2d 1108 (Fla. 2d DCA 2006); *Ashland Oil, Inc. v. Pickard*, 269 So.2d 714 (Fla. 3d DCA 1972).

In this case, there is no reliable evidence that Sculley Boatbuilders conveyed legal title of the Sculley 60' to Mr. Sculley by sale and delivery of the vessel and a valid contract for sale meeting the requirements of the Florida UCC at or before the time of closing and execution of the mortgage. The Bank proffered no evidence of "some writing" sufficient to indicate that a contract  for sale of the vessel - initially valued at over $2,000,00.00 - had been made between Sculley Boatbuilders and Mr. Sculley.  *See e.g. Casazza v. Kiser,* 313  F.3d 414 (8th Cir. 2002)(purchaser failed to produce sufficient writings evincing parties'  agreement for sale of  boat  to satisfy statute of frauds). [22]  S*ee generally Impossible Electronic Techniques, Inc. v. Wackenhut  Protective Systems*, 669 F.2d 1026

---

[21]Section 672.201, Fla. Stat. provides in pertinent part:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. ...

...

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable... (c) with respect to goods for which payment has been made and accepted or which have been received and accepted.

[22]Urging a contrary result, the bank invokes § 672.401(3)(b), Florida Statutes, in support of its contention that title to the Sculley 60' passed to Mr. Sculley pursuant to an implied sales agreement with Sculley Boatbuilders at some indeterminate point in time prior to closing.  The essential defect with this position is that § 672.401 (3)(b), defining the time for passage of title to goods identified to a contract, presumes the existence of a "contract for sale" in the first instance.  The bank presents no evidence of such a contract here, rendering § 672.401 inapplicable.

(11th Cir. 1982)(Fla.); *Topp, Inc. v. Uniden American Corp.,* 483 F. Supp. 2d 1187 (S.D. Fla. 2007);

*Specialized Transportation of Tampa Bay v. Nestle Waters North America, Inc.* 2008 WL 786319

(M.D. Fla. 2008); *Esrick v Mitchell*, 2009 WL 2985679 (M.D. Fla. 2009).

To the contrary, the Bank acknowledged that "there is no written contract between Sculley

Boatbuilders and Mr. Sculley" governing the sale of the Sculley 60'. Moreover, the Bank did not

proffer evidence of any conduct between Sculley and Sculley Boatbuilders which would excuse the

requirement of a writing under § 672.201(c).

Mr. Sculley's signature on the builder's certificate is not itself a "writing sufficient to indicate

that a contract for sale" had been made between Sculley Boatbuilders and Sculley, where the

designation of "James C. Sculley" as the "person(s) for whom built," on the builder's certificate, and

the implication of ownership which the Bank seeks to derive from it, is contradicted by every other

piece of loan documentation in the Bank's file;[23] where the Bank and Mr. Sculley plainly recognized

Sculley Boatbuilders as owner of the collateral both at the time of closing and five years later, in

February, 2008, when they modified the note and designated Sculley Boatbuilders as "grantor(s)"

and "owners ...of any property designed to secure performance of Borrower's obligations to the

Bank, " and where there is no pre-closing evidence of any sales agreement, bill of sale or other

writing memorializing a sale or purporting to effect a conveyance of title between these parties.

---

[23]That the Bank recognized Sculley Boatbuilders as owner of the collateral at the time
of closing is further supported by the "Certificate of Corporate Resolutions and Authorization
to Borrow," which the Bank required as a condition to funding the loan. This document
purportedly memorialized the corporation's consent to Mr. Sculley's use of corporate
property as collateral to secure his personal obligations [Claimant Exhibit No. 51].

On this evidentiary predicate, the Bank has failed to show, by a preponderance of the evidence, that Mr. Sculley held good and valid legal title to the Sculley 60' on January 17, 2003, the day he executed the mortgage. Without title, he had nothing to convey to the Bank, and the mortgage is invalid to create a security interest in the Sculley 60'.[24] Because only a valid mortgage under the Shipping Act is eligible for preferred status under the Ship Mortgage Act, the Bank is not entitled to priority status under the Act.

### C. "Documented" Status of the Sculley 60'

Sunfish alternatively attacks the Bank's claim to priority status by arguing that the Sculley 60' was not a properly "documented" vessel and therefore not eligible for recording under 46 U.S. C. §31321 in the first instance. More specifically, it argues that the vessel did not have an affixed HIN, in violation of federal law, at the time of application for initial issue of certificate of documentation, that the Bank knew of this deficiency when it caused submission of Sculley's application for certificate of documentation along with the supporting builder's certificate. As Sunfish views it, the Bank's complicity in Sculley's misconduct regarding the HIN deficiency led the Coast Guard to issue invalid documentation on the Sculley 60,' thereby defeating the Bank's ability to show the existence of a properly "documented vessel," entitled to recording under § 31322(a) of the Act.

---

[24]The relevant issue is not whether Mr. Sculley had authority to act on behalf of Sculley Boatbuilders to effect a sale or conveyance of the vessel to himself under the *ultra vires* act doctrine. *See e.g. Cambridge Credit Counseling Corporation v. 7100 Fairway, LLC,*, 993 So.2d 86 (Fla. 4th DCA 2008). For purposes of this discussion, the court assumes that he had such apparent authority to act. Rather, the issue is whether the Bank can show, by a preponderance of the evidence, that Mr. Sculley in fact exercised or attempted to exercise such authority on behalf of the corporation by entering into a contract for sale of the vessel, on behalf of Sculley Boatbuilders, with James Sculley, individually. The record does not reveal evidence of such a contract.

The court disagrees. Substantial compliance with the recordation requirements of the Ship Mortgage Act is adequate to show eligibility for preferred status under the Act. Hence, irregularities in the recorded mortgage documents or failure to comply with the minutiae of recording will not result in loss of preferred status of the mortgagee where there is "honest and substantial compliance" with the statutes. *Prudential Ins. Co. of America v. S.S. American Lancer*, 686 F. Supp. 469 (S. D. N. Y. 1988), citing *In re Alberto,* 823 F.2d 712, 719 (3d Cir. 1987) and *Seattle-First National Bank v. Bluewater Partnership*, 772 F.2d 565, 570 (9th Cir. 1985). "A strict construction of the statutory terms should only occur in the face of fraud or, at a minimum, when the complainant can show some injury attributable to [the error]." *Id.*, citing *Morgan Guaranty Trust Co v. Hellenic Lines, Ltd.*, 621 F. Supp. 198, 215 (S.D. N.Y. 1985), quoting *Lake Jackson State Bank v O/S Kingfish Too*, 240 F. Supp. 450, 452 (S.D. Tex. 1965).

In this case, there is no evidence that the Bank knew of any fraudulent design or bad faith on the part of Mr. Sculley when it first accepted his application for initial issue of certificate of documentation and caused it to be submitted to the Coast Guard on Sculley's behalf. Mr. Sculley's failure to permanently affix the HIN to the vessel indisputably violated Coast Guard regulations, but it was not, standing alone, reason to suspect that Mr. Sculley acted in bad faith or with fraudulent design in making his initial application for issuance of certificate of documentation.

Finding no evidence of fraud or "purposeful intent to evade or to mislead," on the part of the Bank, the court finds "substantial compliance" with the recording requirements of the Act, and declines the claimant's invitation to declare the initial documentation on the Sculley 60' invalid due to the HIN misstatement in the underlying application for documentation. *See generally Merchants National Bank of Mobile v. Ward Rig No. 7*, 635 F.2d 952, 958 (5th Cir. 1981)(upholding validity

and preferred status of ship mortgagees in face of numerous errors where there was "not the first breath of fraud or purposeful intent to evade or mislead").  The court, however, will evaluate the Bank's inaction in 2003 in determining whether it is relevant to the claimant's invocation of  the doctrine of equitable subordination discussed below.

### D.  Equitable Subordination

Finally, Sunfish attacks the Bank's claim to priority by invoking the doctrine of equitable subordination.  Originally developed in  bankruptcy law, the doctrine of equitable subordination is used to avoid the inequity of  a claim brought against a  bankruptcy estate that would produce unfair results.  It  allows for subordination of claims when the claimant has engaged in some type of "inequitable conduct" which has  conferred an unfair advantage on the claimant or resulted in injury to creditors.  *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).  Inequitable conduct "encompasses conduct that may be lawful but is nevertheless contrary to equity  and good conscience."  *Picard v Katz*, 462 B.R. 447 (S.D.N.Y. 2011)(trustee of Madoff Securities' estate could potentially subordinate claims of brokerage firm customers, where they invested with Madoff Securities with knowledge or in reckless disregard of its fraud), citing *In re Verestar, Inc.*, 343 B.R. 444, 461 (S.D.N.Y. 2006).  For non-insider creditors, it must encompass  "egregious misconduct," variously described  as "very substantial" misconduct  involving "moral turpitude" or some breach of duty or other misrepresentation whereby other creditors are  deceived  to their detriment, or gross misconduct amounting to fraud, overreaching or  spoliation."  *In re M. Paolella & Sons, Inc.,*  161 B.R. 107, 118 (E.D. Pa. 1993), citing *In re Osborne*, 42 B.R. 988 (W.D. Wis. 1984);  *Century Glove Inc. v. Iselin,* 151 B.R. 327 (B.R. 1993);  *In re Delphi   Corp.,* 2008 WL 5146952 (S.D. N.Y. 2008)(gross negligence reflecting  reckless indifference to the rights of others).

30

While mere negligence in continuing to lend to a grossly undercapitalized debtor has been held insufficient, by itself, to invoke the doctrine, *see e.g. Stratton v Equitable Bank, N.A.* , 104 B.R. 713, 731 (D. Md. 1989), actual knowledge of improper or fraudulent behavior of the debtor is not required.  "[A] creditor cannot be willfully blind to the details of a fraud to avoid actual knowledge." *Grede v Bank of New York Mellon*, 441 B.R. 864 (N.D. Ill. 2010), citing *Mishkin v. Siclari* (*In re Adler, Coleman Clearing Corp.*), 277 B.R. 520, 544, 566 (S.D. N.Y. 2002)(subordinating claim of defendant who "knowingly closed his eyes" to a fraud).

Extension of the doctrine of equitable subordination to admiralty law is also well-established. *Compare Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1233 (11th Cir. 2006) (postponement of declaration of default on  loan for a reasonable period of time (six months) held insufficient to warrant equitable subordination of bank's preferred ship mortgage) with *Wardley International Bank, Inc. v.  Nasipit Bay Vessel*, 841 F.2d 259 (9th Cir. 1988)(subordinating bank's alleged  preferred ship mortgage  to maritime  liens of suppliers, where bank engaged in inequitable conduct  to effectively extend its rights in vessel for additional  five years); *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561 (5th Cir. 1986)(sham mortgage taken by corporation which transferred title to wholly owned subsidiary); *Cantieri Navali  Riuniti v.  M/V Skyptron* , 621 F. Supp. 171 (W.D. La. 1985); citing G. Gilmore & C. Black, The Law of Admiralty (2d  ed. 1975) § 9-84.  *See also  TransMontaigne Product Services, Inc. v.  M/V Wilbur R. Clark*, 679 F. Supp. 2d 1308 (S.D. Ala. 2009); *United  States v. Pride of Texas*, 964 F. Supp. 986, 990 (E.D. Va. 1994).

In determining whether the doctrine should be applied in the case at bar, the court first considers the Bank's action – or rather inaction – in 2003.  By virtue of the Harbour survey, the Bank knew that Sculley Boatbuilders had failed to affix the HIN to the vessel before the vessel was

documented in 2003.  This constituted a serious violation of federal regulations and industry practices.  Yet the Bank agreed to fund the loan without insisting that Sculley Boatbuilders comply with the law.  In this very real sense, the Bank's gross negligence paved the way for Mr. Sculley's fraud.

Next, the court considers the Bank's actions during the 2008 modification process.  Although the Bank did not have cause to initially suspect wrongdoing by Mr. Sculley when it closed the loan in January, 2003, it had cause to suspect something was terribly amiss by February, 2008, when Mr. Sculley had just defaulted on a $800,000 balloon payment, presented with a stunning debt-to-income ratio of 157%, reported an $11 million decrease in net worth, and was besieged with tax liens. Despite the debtor's escalating financial stranglehold, the bank granted Mr. Sculley a five-year extension of the loan term, without inspecting the collateral, much less reevaluating it or insisting on proof of insurance.  Had the Bank exercised a modicum of due diligence at that juncture, it would have learned that Sculley Boatbuilders had long since sold the boat to a third party purchaser under a different HIN, a blatant "red flag" of fraud.

There was nothing remotely reasonable about the Bank's decision to forego a declaration of a default on Mr. Sculley's loan in January, 2008 and attempt to extend its rights in the collateral for an additional five years.  Under the original mortgage, the Bank was entitled to take possession of the vessel after Mr. Sculley defaulted on the balloon payment.  Instead, it chose to enter into a note modification agreement, and did not proceed judicially to enforce Mr. Sculley's obligations under the note until Mr. Sculley died – long after the vessel had been conveyed to subsequent innocent purchasers for value.

Having failed to take the most elementary, reasonable precautions to protect its security

interest in the collateral in early 2008, when it had the right, cause and opportunity to do so -- all to the foreseeable detriment of subsequent purchasers and lienors of the collateral -- the doctrine of equitable subordination is appropriately invoked now to displace its claimed priority status under the Act. [25]

Viewed in combination, these two events – the Bank's gross deviation from acceptable banking practices in 2008 and its failure to insist that Sculley Boatbuilders permanently affix the HIN on the vessel before initial documentation in 2003 --justify the subordination of the Bank's mortgage in this case. *Compare Maryland National Bank v Vessel Madam Chapel*, 46 F.3d 895 (9th Cir. 1995)(declining to disturb mortgagee's preferred status under Ship Mortgage Act under doctrine of equitable subordination where bank was unaware of events leading to issuance of second federal registration).

### III. Decretal Provisions

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The Plaintiff **BRANCH BANKING & TRUST CO. of VIRGINIA's** complaint to foreclose a First Preferred Ship Mortgage is **DENIED.**

2. Final judgment is entered against the Plaintiff, **BRANCH BANKING & TRUST CO. of VIRGINIA,** and in favor of the Claimant, **SUNFISH MARINE VENTURES, LTD.,** which shall take the **M/Y BEOWULF** free and clear of any mortgage liens claimed by the Plaintiff.

3. The arrest of the **M/Y BEOWULF** is vacated, and the U.S. Marshal is directed forthwith

---

[25]As discussed, *supra,* the court has concluded that the mortgage claimed by the bank is invalid because the Bank does not show, by a preponderance of the evidence, that Mr. Sculley held valid title to the vessel at the time he made the mortgage. The court's ruling on equitable subordination is an additional and alternative basis for its decision in this action.

to return the vessel to **SUNFISH MARINE VENTURES, LTD**., its rightful owner.

4.  The court reserves jurisdiction to tax costs in favor of Claimant, **SUNFISH MARINE**

**VENTURES, LTD**.

**DONE AND ORDERED** in West Palm Beach, Florida this 7th day of June, 2012.


Daniel T. K. Hurley
United States District Judge


cc. All counsel